IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DIANA F. OGDEN,

       Plaintiff,

    v.                             Civil Action No. 2:04-CV-67

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
          Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I. Introduction

A.    Background

      Plaintiff, Diana F Ogden, (Claimant), filed her Complaint on September 20, 2004, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on January 5, 2005.[2]

Claimant filed her Motion for Summary Judgment with Memorandum on February 2, 2005.[3]

Commissioner filed her Motion for Summary Judgment and Brief in Support on April 4, 2005.[4]

Claimant filed her Response to Defendant's Motion for Summary Judgment on April 15, 2005.[5]

B.    The Pleadings

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket Nos. 10.

[4] Docket Nos. 13 and 14.

[5] Docket No. 15.

1. <u>Claimant's Motion for Summary Judgment with Memorandum on February 2, 2005.</u>[6]

2. <u>Commissioner's Motion for Summary Judgment and Brief in Support.</u>[7]

3. <u>Claimant's Reply to Defendant's Motion for Summary Judgment.</u>[8]

C. <u>Recommendation</u>

I recommend that Claimant's Motion for Summary Judgment be DENIED, and Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ (1) properly considered Claimant's treating and examining physicians' opinion; (2) correctly determined that irritable bowel syndrome was not a severe impairment and posed a proper hypothetical to the VE; (3) properly considered Claimant's obesity; and (4) conducted a proper credibility analysis. Finally, Claimant's additional evidence, submitted to the Appeals Council, does not require a remand.

## II. Facts

A. <u>Procedural History</u>

On May 21, 1996, Claimant filed for Disability Insurance Benefits (DIB). The application was denied initially and on reconsideration without further appeal. On October 8, 2002, Claimant filed a new application for DIB, alleging disability since July 31, 2002. The application was denied initially and on reconsideration. A hearing was held on September 11, 2003 before an ALJ. The ALJ's decision, dated October 23, 2003, denied the claim finding Claimant not disabled within the

---

[6] Docket No. 10.

[7] Docket Nos. 13 and 14.

[8] Docket No. 15.

meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on August 25, 2004. This action was filed and proceeded as set forth above.

B.    Personal History

Claimant was 52 years old on the date of the September 11, 2003 hearing before the ALJ. Claimant has a high school equivalency diploma and has past relevant work experience as a secretary and self-employed owner/operator of a small retail bookstore.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: July 31, 2002–October 23, 2003.

**Davis Memorial Hospital, Discharge Summary, 11/14/2002, Tr. 122**
DISCHARGE DIAGNOSIS:    1. Musculoskeletal chest pain.
2. Nausea and vomiting, reflux.
3. Morbid obesity.
4. Diabetes mellitus, uncomplicated but uncontrolled of nw onset.
5. Hyperlipidemia.
6. Rib pain.

**Davis Memorial Hospital, History and Physical, 10/3/2002, Tr. 125**
ADMITTING IMPRESSION:    1. Acute chest pain.
2. Abdominal discomfort.
3. New onset diabetes mellitus–glucose 305.

**CT Abdomen, 10/04/2002, Tr. 128**
IMPRESSION: There is fatty infiltration of the liver but I see no other significant abnormality.

**NUC 7071-SPECT-CARDIAC (CARDIOLITE), NUC 7141-ADENOSITE INJ., 6 mg,10/03/2002, Tr. 129**
IMPRESSION: No evidence of ischemia.

**Radiology Study, Chest, 10/02/2002, Tr. 130**
IMPRESSION: Negative

**Dr. Kip Beard, 12/22/2002, Tr. 155-160**
IMPRESSION:    1. Diabetes mellitus, type II.

2. Chest pain, atypical for angina.
3. Hypertension.
4. Asthma.
5. Status post bilateral knee surgery.
   A. Osteoarthritis.
6. Exogenous obesity.
7. History of pancreatitis.
8. Irritable bowel syndrome.
9. Gastroesophageal reflux disease.
10. Recurrent kidney stones status post lithotripsy and stent placement.

**Dr. Hugh M. Brown, Physical Residual Functional Capacity Assessment, 12/31/2002, Tr. 161-168**

EXERTIONAL LIMITATIONS:
Occasionally lift and/or carry, 20 pounds;
Frequently lift and/or carry, 10 pounds;
Stand and/or walk for a total of, at least 6 hours in an 8-hour workday;
Sit for a total of, about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.

POSTURAL LIMITATIONS:
"None established" in all categories.

MANIPULATIVE LIMITATIONS:
"None established" in all categories.

VISUAL LIMITATIONS:
"None established" in all categories.

COMMUNICATIVE LIMITATIONS:
"None established" in all categories.

ENVIRONMENTAL LIMITATIONS:
"None established" in all categories.

SYMPTOMS:
Considering degree of subjective pain, and in view of the objective findings, degree of obesity, ROM of knee, normal gain–RFC reduced to light.

**Dr. Thomas Lauderman, Physical Residual Functional Capacity Assessment, 3/10/2003, Tr. 169-176**

EXERTIONAL LIMITATIONS:
Occasionally lift and/or carry, 20 pounds;
Frequently lift and/or carry, 10 pounds;

Stand and/or walk for a total of, at least 6 hours in an 8-hour workday;
Si for a total of, about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.

POSTURAL LIMITATIONS:
Climbing, balancing, stooping, kneeling, crouching, crawling, occasionally.

MANIPULATIVE LIMITATIONS:
"None established" in all categories.

VISUAL LIMITATIONS:
"None established" in all categories.

COMMUNICATIVE LIMITATIONS:
"None established" in all categories.

ENVIRONMENTAL LIMITATIONS:
"None established" in all categories.

SYMPTOMS:
Client has some decrease in AOL's; SOB however lung (unintelligible); takes Albuterol for asthma.

**Dr. Khan, Physician's Physical Capacities Evaluation, 2/20/2003, Tr. 179-181**
I.  In an 8-hour workday:
sit, 2 hours
stand/walk, 2 hours
sit for 20 minutes at a time without needing to change position
stand for 1 hour at a time without needing to change position
Limitations due to pain, fatigue, shortness of breath–pain due to surgeries; shortness of breath-asthma; diabetes-fatigue.
Will need the flexibility to change position, frequently

II.  Claimant can lift, 11-20 lbs., occasionally
Limitation dues to pain with legs and SOB

III.  Claimant can carry, 21-50 lbs., occasionally
Limitation due to SOB and leg pain

IV.  Limitations due to arthritis:
Right and left: Pushing and Pulling, simple grasping, fine manipulation

V.  Limitation due to multiple surgery on legs/arthritis, both feet

VI.. Claimant is able:
A. Bend, occasionally.
B. Squat, not at all.
C. Crawl, occasionally.
E. Reach Above, frequently.
F. Stoop, occasionally.
G. Kneel, occasionally.
Limitation due to multiple surgeries on legs/arthritis.

VII. Claimant can tolerate:
A. Exposure to unprotected heights, not at all.
B. Being around moving machinery, occasionally
C. Exposure to marked changes in temperature, frequently.
D. Driving automotive equipment, frequently.
E. Exposure to dust, fumes, gases, smoke, and perfumes, occasionally.
F. Exposure to noise, occasionally.
G. Chemical, not al all.
H. Jumping, not at all.
Limitations due to asthma and allergies.

VIII. Objective signs of pain: post surgical syndrome/adhesions; muscle spasm; arthritis changes; tenderness to palpation; limitations of motion, OA both knees; CBP; l/p/ spine OA.

IX. Degree of pain reasonably related to the underlying condition, moderate.

X. Pain is chronic.

XI. Claimant will need unscheduled interruptions of work routine, frequently

XII. Claimant will probably miss work due to exacerbation of pain, frequently.

XIII. Claimant is unreliable.

**Dr. Khan, 10/17/2002, Tr. 194**
Diet is right; diabetes mellitus, type II, uncontrolled; exercise.

**Dr. Khan, 9/20/2002, Tr. 195**
Pain, abdomen; obesity, weight gain; dyspnea.

**Dr. Khan, 10/23/2002, Tr. 197**
Diabetes Mellitus, type II; in depth control, sugars improving.

**Dr. Khan, 11/4/2002, Tr. 198**
DM, type II, insulin dependent.

**Dr. Khan, 12/23/2002, Tr. 199**
DM, type II, uncontrolled; exercise program.

**Dr. Khan, 12/18/2002, Tr. 200**
DM, type II.

**Dr. Khan, 12/20/2002, Tr. 201**
DM, type II, uncontrolled; improving control.

**Dr. Khan, 1/8/2003, Tr. 204**
DM, type II, reasonable control.

**Davis Memorial Hospital, CT Abdomen, 2/17/2003, Tr. 209**
IMPRESSION:   Unremarkable study.

**Dr. Khan, 2/28/2003, Tr. 210**
Abd. pain, DM, type II, diarrhea, [unintelligible].

**Dr. Khan, 5/29/2003, Tr. 211**
Dyspnia, bronchitis, htn, [unintelligible].

**Dr. Kahn, 5/15/2003, Tr. 213**
[Unintelligible] edema.

**Davis Memorial Hospital, Sinuses, Paranasal, 5/15/2003, Tr, 214**
IMPRESSION: Normal sinus exam.

**Dr. Khan, 5/9/2003, Tr. 215**
Renal calculi, HTN, DM, type II, edema, [unintelligible].

**Dr. Khan, Tr. 216**
HTN; DM, type II; obesity; [unintelligible]; no decrease sugars spd.

**Dr. Syed N. Haq, 12/8/2003, Tr. 313**
History: hypertension, gastritis, pancreatitis, uncontrolled type II diabetes, elevated AST and LT levels.

D.      Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 314-346):

Q       Okay.  Now you indicate you became disabled around a year ago, around July 31 of last year.  What's been the main - - what happened around then?  What's been the main problem affecting your ability to work since then?

A       At that time, I was having a difficult time with reoccurring kidney stones.  I was in and out of the hospital most of the time.  And I'm sure you have records to document where I've been in the hospital quite a bit.  And I - -

Q       Well, you have some.  I don't know - - I was looking through [INAUDIBLE] that Mr. Miller submitted today.

ATTY       It's Dr. Chua, Your Honor, that she's speaking of.

*              *              *

CLMT       He done seven lithotripsies for me, and couldn't remove some of the stones, and then, for - -

ALJ       Most of these looked - - most of these look like they're before - -

CLMT       Yes.

ALJ       - - before July of - -

CLMT       Yes.

ALJ       - - of '02.

CLMT       That's when it started.  That's when I got my son, was working most of the time for me.

ALJ       Well, actually, the latest record from Dr. Chua is dated May of '02.  And the alleged onset date is July '02.

ATTY       On - - I thought there was actually some in there from July, Your Honor.

                  *            *            *

Q        Okay.  Well, what kind of problems have you had from your kidney - - from kidney stones?

A        Most of the times, when they move, they cause me severe pain and vomiting and nausea, and sometimes, they'll go ahead and pass, and then other times, they don't, and when they don't, I have to go to the emergency room.

                  *            *            *

Q        Well, when was the last time you were in the emergency room?

A        I think it was in July.  No. No, no.  I'm sorry.  It was in October, because October is when they diagnosed me with diabetes.

                  *            *            *

BY ADMINISTRATIVE LAW JUDGE:

Q        How often would you go into the emergency room?

A        Oh, maybe sometimes twice a week.  There for a while, I was going it seemed like all the times, but I know it wasn't that regular.  It was probably maybe once or twice a month.

Q        And then, why did you stop work in July of last year?

A        I just - - I couldn't do it.  I felt bad most of the time, and I wasn't aware, up until the last part of September, 1st of October, that I was diabetic.  I knew I was hypoglycemic most of my life from a child, but I had no idea it had developed into high blood sugar, and I stayed sick most of the time, and wore out, and the fact that I couldn't stand on my legs for a long period of time, because I've had so many surgeries on them.

Q        Why can't you stand on your legs?

A        I've had seven operations on my right leg, and one on my left, due to an accident where I got run into by a four wheeler, and Dr. Lester has repeatedly done exterior cruciate [phonetic] ligament repair, anterior [phonetic] cruciate ligament repair, plus cartliage repair.

Q        How many - - in both knees?

A        I've had surgery on both knees.  I've had cartilage repair on my left knee, and sometime - - and my right leg is actually a quarter of an inch longer now, due to all the surgeries on it, and it makes it difficult for me to stand for long periods of time.  Because sometimes, even sitting, my legs go numb.

Q        How long can you stand at a stretch before you'd have to sit down?

A        I could probably stand 15, 20 minutes.

Q        How about walking?  How far can you walk [INAUDIBLE]?

A        [INAUDIBLE] - - most of the time, I can't walk very far, due to the asthma.  I have trouble breathing.

                        *                *                *

Q        If you have an asthma attack and take the albuterol, does that clear up your breathing?

A        Sometimes, yes.  I've had a few times I've actually had to go to the hospital for the breathing problems.

Q        When was the last time you did that?

A        It's been a couple years ago.

                        *                *                *

Q        Yeah.  Do you have any problems with your hands or fingers?

A        They go numb.  The doctors have told me I have arthritis.  I have bursitis in my right shoulder that Dr. Lester found a few years ago.

*               *               *

Q        Do you have any side effects from any of the medicines you take?

A        I just get tired or sleepy.  Sometimes, I have problems driving, or anything like that, because I get sleepy.

Q        Does anything cause the sugar - - do you take a - - are you on a special diabetic diet?

A        Yes, sir.  It's a low carbohydrate diet.

Q        And have you lost weight?

A        Yes, sir.  I was 273.

Q        So, you lost about 40 pounds.

A        Yes, sir.

Q        But did the diet help keep the sugar in control?

A        No.  My sugar's not in control, sir.

Q        What kind of problems does it cause you, when you say it's - - when it's high in the morning?

A        I have problems seeing.  It affects my vision, and it affects my ability to function. I feel fatigued most of the time.

*               *               *

Q        Is there anything that causes your sugar to get out of control?

A        Well, stress.  The doctor tells me about that all the time.

Q        Yeah.  What kinds of things cause you stress?

A        Well, just - - I really can't answer that, because you know, some days, I'm - - I get up and I'm hyper, and then a lot of things goes on in your family life, you know, with your children and things, that puts a little pressure, which you don't need.

Q        Okay.  Do you think you could do a job where you'd be standing for about four hours a workday?

A        No, sir.  I don't.

Q        Why not?

A        Because my legs won't hold me that long.  My legs give out on me, and they get - - I have severe pain with my legs.

*                *                *

Q        Do you have any hobbies, or anything you still enjoy doing?

A        Most of them, I can't do no more, because I can't breathe.  I used to walk a couple miles a day, and I can't do that now, because my legs don't work right.  And I can't breathe.

Q        When did you walk?

A        It's been about three years ago since I've done any active walking at all.

*                *                *

A        My pancreas has stents in it, sir.

Q        So, that's taken care of?

A        I still have problems with it.  I have - -

Q        What kind of problems are you - -

A        It still bothers me at times.  Dr. Khan says it's due to the fact that it tries to work

now when it's not able to work, and I have problems with my liver.

Q        What kind of problems do you have from your liver?

A        A lot of pain from it.

Q        Why [INAUDIBLE] - -

A        It's damaged.   The same thing with the pancreas.  The doctor that did my gallbladder surgery years ago didn't see the stones that had floated over into my liver, and that's what damaged - - or my pancreas, rather, and that's what damaged it, was the stones had been in there for a few years.  And that's what the doctor informed me at Morgantown, and he put stents in it to help it drain, and I still have problems with it, and both my tests that they've done from the hospital and - - the last one, Dr. Khan said my liver enzymes are still out of control, which I know, because my side hurts most of the time.

*              *              *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        She had scars on both legs.  Ms. Ogden, I'd like to ask you a few questions about some of your medical problems.  First, I'd like to ask you about your knees.  Do you still have any problems with your knees?

A        Yes, sir.

Q        What type of problems do you have with your knees?

A        Standing on them.  I can't - - if I would jump down, my knees won't hold me.  If I would get out of a high truck or something and come down hard, they won't hold.  They buckle.

Q        Do you have pain in your knees?

A        Yes, sir.  All the time.

Q    In one or both knees?

A    Basically, my right one.  It hurts all the time.

Q    Okay.  And is that the one that you had the - -

A    Yes, sir.

Q    - - you had seven surgeries on [INAUDIBLE] - -

A    Seven operations on.

Q    Is there anything that makes your knees hurt more or less?

A    The weather.  The weather affects them.

Q    Does being on your feet or walking affect your knees?

A    It causes them to swell.  My whole legs swell when I stand on them a lot.

Q    Well, now that you've mentioned that, let me ask you about that.  Do you take a fluid pill?

A    Yes, sir.  I take it - - Dr. Lester, or - - Lester - - Dr. Khan just increased it about three weeks ago.  I take 40 units twice a day.

Q    Do you see swelling in your legs?

A    Yes, sir.

Q    In what part of your legs?

A    Basically, from my knee down to my ankles, they get real big.

Q    How often do you notice that swelling?

A    About every day, and if I don't take it - - most of the time, if I don't take the fluid pill, I can't breathe.  It affects my breathing.

*          *          *

14

Q    Okay.  Let me ask you about the morning.  When you take the fluid pill in the morning, how long before it has an effect on you?

A    About 45 minutes.

Q    Okay.  And then, after 45 minutes, what happens?

A    I have to run to the bathroom every few minutes.

Q    Let's say in an hour, how many times would you go to the bathroom?

A    Maybe 10 or 15 times.

Q    Okay.  And how long does that last?

A    It lasts for about two hours.  Sometimes, a little more.

*                    *                    *

Q    Okay.  Now, do you have to elevate your legs?

A    Yes, I do.

Q    Did anyone tell you to do that?

A    Dr. Khan told me to do that.

Q    How - -

A    To keep them up.

Q    How often do you do that?

A    I try to do it of a day, most of the day, because like I told you, I lay a lot on the couch.

*                    *                    *

Q    Well, let's - - we'll talk about that in just a second.  With your legs, can you give me an estimate, let's say in an eight hour time period during the day, about how much time you

15

spend elevating your legs?

A       Probably about four.

                                  *            *            *

Q       Have you had any particularly bad experiences when your blood sugar - -

A       Yes, sir.

Q       - - went low?

A       Yes, sir.  And I'm glad my bodyguard was there, because I went to the refrigerator to get some stuff out to fix to eat, and I fell on the floor.

Q       Did you - -

A       And - -

Q       Did you lose consciousness?

A       I didn't go completely out.  I just - - everything went numb, and went black, and I told him help.

Q       Okay.  When did that happen?

A       It's been a few months ago.

Q       And how many times has that happened to you?

A       It's happened twice, but I'm learning more to recognize the signs than I did back then.  I've always had low blood sugar, but I've never had it affect me like it has with the insulin.

Q       Now, you mentioned - - how many times - - it's happened twice in what time frame?

A       In the last two months.

Q       Okay.  It - - is that why Dr. Khan suggested you have someone with you?

A      Yes.

Q      And how long has someone been staying with you?

A      Cindy's been with me probably about three months now.  Dr. Khan had told my husband, when he put me on the - - increased the insulin, that I should have somebody with me, that I shouldn't be by myself, until I learned how to deal with the low blood sugar issue.

Q      You mentioned also that you have irritable bowel.

A      Yes, sir.

Q      How does that affect you?

A      It's - - I have no control sometimes.  And when I have to go to the bathroom, I have to go then.

Q      It's very urgent?

A      Yes, yes.

Q      I know it might be a little bit embarrassing, but do you ever have accidents?

A      Yes, sir.

Q      Do you have an estimate of how often that happens to you?

A      It just happens if I'm not some place where I can go immediately.

Q      How often are you having these types of problems from irritable bowel?

A      I have them probably every day.  A lot of things - - if I get real nervous and real upset, it's affected by those things.  And sometimes, the food.  A lot of times, after I eat, especially breakfast, that happens.

Q      Okay.   You were talking earlier with the judge about pain in your abdomen.

A      Yes, sir.

Q       How often are you having that pain?

A       All the time.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 346-355 ):

*               *               *

ALJ     Okay.  Mr. Bell, could you please access the claimant's past work by job title, exertional level, skill level, any transferability of skills?

VE      Yes, Your Honor.  Her work as a bookstore manager, normally, that's classified in the DOT as light and skilled.  It sounds like, as she was performing it, that it was actually sedentary.  The work that she had as a secretary for the County Commission, the secretary, according to the DOT, is sedentary and skilled.

ALJ     Would there be transferable skills to other sedentary jobs?

VE      There are other sedentary classifications in the clerical area.  For example - - just a minute, Your Honor, let me get this other book out.  For example, there is the general secretarial classification transfers according to the Guide for Occupational Exploration to school secretary in the educational field, legal secretary, especially with her background at the County Commission.

ALJ     And those are all sedentary?

VE      Yes, those are sedentary, Your Honor.

ALJ     And they have the same or lower SVP - - wait a minute. [Off the record.] [On the record]

BY ADMINISTRATIVE LAW JUDGE:

Q       This is tape 2 in the case of Diana Ogden, Social Security Number 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. You indicated that those other secretarial jobs were sedentary.

A       Yes.

Q       And do they have the same or lower SVP as the secretarial job that she prior - - previously did?

A       They had the exact same SVP of 6, Your Honor.

Q       Okay.  Let me give you a hypothetical question.  If we assume a person of the same age, education, and work experience as the claimant.  Assume a person who's able to do light work, as that's defined in the Commissioner's regulations, but there'd be no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling.  And the jobs should not involve - - no standing or walking more than four hours total in the day.  And no standing or walking more than about 15 minutes at a stretch.  The person should be able to use a restroom on an unscheduled basis.  About every hour, for a minute or two.  And the person should be able to take a brief time to either eat a small snack, or check blood sugar at the worksite, and this would just take a minute or two.  And there'd be no extreme exposure - - no exposure to extremes of fumes, dusts, gases, or other respiratory irritants.  They should be able to use a nebulizer once during the work day for about 15, 20 minutes.  Would such a person be able to do any of the past jobs, or any of the jobs that the skills would transfer to?

A       The sedentary jobs, I believe that they would be able to do some of those, based on the hypothetical.

Q       Which of the sedentary jobs?  Is the past relevant work as a secretary - -

A       Yes.

Q       And then also the ones that the skills would transfer to.

A       Transfer, yes.  You did say at light, right?

Q       Yes.  I started out with light - -

A       Right.  Right. [INAUDIBLE]

Q       But there was no standing or walking more than four hours total.

A       Right.

Q       Or more than 15 minutes at a stretch, so that - -

A       Right.

Q       That would presumably reduce the number of light jobs dramatically.  Would there be any unskilled light or sedentary work such a person could do?

A       Yes, Your Honor.  At the light level.  For example, office helper.  150,000 nationally, 850 regionally.  And there would be some ticket taker jobs.  I'd have to give a - - I'll give you the total number and a reduction, just to be on the safe side.  190,000 nationally.

CLMT         What is it?  What kind of jobs?

ALJ          Ticket taker.

CLMT         Ticket.

VE           Ticket taker.  190,000, this is at light.  190,000 nationally, 1,700 regionally, and just to be on the safe side, I'd reduce those by half.

BY ADMINISTRATIVE LAW JUDGE:

Q       And why is that?

A       Some of the places might not be as conducive to the - - to all the details there that you have.  For restroom facilities and things like that, just depend on the location of the restroom

- -

Q     Okay.

A     - - and things like that.

Q     Any sedentary?  Well.  Well, actually, are there any other light jobs that would fit this?

A     Well, it greatly reduces the pool of - -

Q     Yeah.

A     - - of light jobs, because of that four hours.

Q     Yeah.

A     You know, by definition, you know, you're talking about being able to stand six. In practicality, there are a few, but I - - you're greatly limiting the pool.

Q     Yeah.  Okay.  Is your testimony consistent with the DOT?

A     Yes, sir.

Q     Okay.  And how many days, if any, can a person miss work, and still be able to do the kinds of  jobs we've been talking about?

A     If you're going to miss more than two days per month consistently, I think that would prompt a supervisor to intervene, and then, if not corrected, that would result in termination, if not corrected.

   E.     <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Morbid obesity. (Tr. 122).

- Can stand, 15-20 (Tr. 322).

- Can sit, 1 hour (Tr. 323)

- Can lift a case of pop (Tr. 323).

- Can use a knife and fork (324).

- Washes the dishes (Tr. 328).

- Does laundry (Tr. 328).

- Cooks (Tr. 328).

- Reads books (Tr. 328).

- Watches television (Tr. 328)

- Does the shopping for groceries (Tr. 329).

- Goes to church and restaurants (Tr. 329).

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in failing to properly consider Claimant's treating physician's opinion and in giving undue weight to Dr. Beard; (2) in failing to include irritable bowel syndrome as a severe impairment and in posing an improper hypothetical question to the VE; (3) in failing to properly consider Claimant's obesity; and (4) in failing to conduct a proper credibility analysis.    Additionally, Claimant alleges that the additional evidence submitted to the Appeals Council warrants a remand.

Commissioner maintains that the ALJ's decision was supported by substantial evidence.

Specifically, Commissioner contends that the ALJ properly considered the treating and examining physicians' opinions; properly determined that Claimant's irritable bowel syndrome was not a severe impairment and posed a proper hypothetical question to the VE; properly considered Claimant's obesity; and, conducted a proper credibility analysis. Finally, the Commissioner counters that the Appeals Council properly considered the additional evidence provided by Claimant.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.       Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.       Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.       Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.       Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.       Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.      Evidence - Weight.  The ALJ is required to indicate the weight given to all relevant evidence.  Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984).  However, the ALJ is not required to discuss every piece of evidence.  Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

11.      Social Security - Treating Physician - Opinion that Claimant is Disabled.  An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927.  A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability.  Id.  No special significance will be given to the source of an opinion on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

12.  Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable

clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

13. Social Security - Treating Physician - Speculative Opinion. An ALJ is not bound to accept the opinion of a treating physician which is speculative and inconclusive. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

14. Social Security - Treating Physician - Not Entitled to Controlling Weight. When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization. 20 C.F.R. §§ 404.1527(d), 416927(d). When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s). 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

15. Evidence Considered in Evaluating the Intensity and Persistence of Claimant's Symptoms and Determining the Extent to Which Claimant's Symptoms Limit Her Capacity for Work. The Commissioner will take into account all of the following information when assessing a Claimant's subjective complaints of pain: information that Claimant, Claimant's treating or examining physician or psychologist, or other persons provide about Claimant's pain or other symptoms; any symptom-related functional limitations and restrictions which Claimant, Claimant's treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence; all of the evidence

presented, including information about Claimant's prior work record, Claimant's statements about her symptoms, evidence submitted by Claimant's treating physician or psychologist, and observations by our employees and other persons; and factors relevant to Claimant's symptoms such as, (i) daily activities, (ii) location, duration, frequency and intensity of pain and other symptoms, (iii) precipitating and aggravating factors, (iv) type, dosage and side effects of pain medication Claimant takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, Claimant receives or has received for relief of pain or other symptoms, (vi) any measure Claimant uses or has used to relieve pain or other symptoms, and (vii) other factors concerning Claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

16.     <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. <u>Id</u>.

17.     <u>Light Work</u>. Light work is defined in the regulations as: "lifting no more than 20

pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

18.      Social Security - Combined Impairments. "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe." Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted). "[T]he Secretary must consider the combined effect of a claimant's impairments and not fragmentize them. Id. "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments. Id.

19.      Social Security - Claimant's Credibility - Pain Analysis. The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

20.      Social Security - Vocational Expert - Hypothetical. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at

*5 (4th Cir. Jan.11, 1999)[9], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations. Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

21. Social Security - New Evidence - Consideration by Appeals Council. The Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (citing Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)); 20 C.F.R. § 404.970(b).

22. Social Security - New and Material Evidence - Appeals Council. Evidence is not "new" if other evidence specifically addresses the issue. Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991). Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Id.

23. Social Security - New Evidence -Remand - Burden on Claimant. "A claimant seeking remand on the basis of new evidence under 42 U.S.C. § 405(g) must show that the evidence is new and material and must establish good cause for failing to present the evidence earlier. Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (en banc).

C. Discussion

1. Improper Evaluation of the Treating Physicians' Opinion
and
Giving Undue Weight to a One-Time Consultative Examination.

---

[9] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

Claimant asserts that the ALJ improperly evaluated the opinions of Dr. F. A. Khan and Dr. Domingo Chua, Claimant's treating physicians, and, instead, gave undue weight to the opinion of Dr. Kip Beard, a consultative physician. Commissioner counters that the ALJ gave proper weight to Claimant's treating and examining physicians.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also, Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

At the outset, it should be noted that Claimant's argument that the ALJ erred because he did not specifically discuss Dr. Khan and Dr. Chua's treatment notes is without merit. Although the ALJ is required to indicate the weight given to all relevant evidence, Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ discuss every piece of evidence.[10] Therefore, this Court must examine the record to determine whether there is

---

[10] The Undersigned notes that the Seventh Circuit has held that a written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. See Green V. Shalala, 51 F.3d 96, 101 (7th Cir.1995). Also, the Eighth Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it. Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998).

substantial evidence for the ALJ's decision.

In this case, the ALJ has sufficiently articulated his assessment of the evidence and properly disregarded Dr. Khan's opinion because his opinion was contradicted by substantial evidence. Although Claimant alleges that the ALJ "failed to even consider an entire body of treatment records,"[11] as stated above, the ALJ's failure to cite specific treatment notes does not establish that the ALJ failed to consider them. Additionally, in his February, 2003 assessment of Claimant's physical capacities, Dr. Khan opined that Claimant could neither stand, walk or sit for more than two cumulative hours within an eight-hour workday. (Tr. 24, 179-181 ). The ALJ did consider Dr. Khan's finding and specifically stated that "such an extreme restriction is not supported by any objective medical evidence." (Tr. 24). The ALJ found that Dr. Khan's opinion is inconsistent with the evidence from medical specialists and reviewing physicians. Specifically, the state agency medical consultants, Dr. Brown and Dr. Lauderman, found that Claimant could perform a range of light work notwithstanding her impairments. (Tr. 24, 161-176). Additionally, Dr. Beard, a consultative examiner, noted that Claimant presented without any ambulatory aids or assistive devices and ambulated with a normal gait and without limp. (Tr. 157, 158). Dr. Beard also opined that Claimant evidenced only mild difficulty arising from her seat and stepping up and down from the examining table, attributed to knee discomfort. (Tr. 157). She was, however, observed to be comfortable while seated or supine. (Tr. 157). She could also heel walk, toe

---

See also, Walker v. Secretary of Health and Human Services, 884 F.2d 241, 245 (6th Cir.1989)(reviewing court many examine all the evidence, even if it has not been cited in the Secretary's decision).

[11] Claimant refers to Dr. Khan's treatment notes from 12/9/1998 to 8/15/2003, including a RFC form, completed by Dr. Khan on February 28, 2003.

walk, heel-to-toe walk and squat two-thirds of the way with some knee pain difficulty upon arising (Tr. 159 ).  Dr. Beard found no end organ damage related to Claimant's diabetes or hypertension (Tr. 159).   Because Dr. Khan's February 2003 opinion is inconsistent with other substantial evidence in the record,  the ALJ did not err when he did not give controlling weight to the opinion of Dr. Khan.  The ALJ also afforded proper weight to Dr. Beard's opinion.

With respect to Dr. Chua, the record reveals that Dr. Chua treated Claimant for her kidney problems.  For example, on April 25, 2002, Dr. Chua performed a cystoscopy and the insertion of a double J stent.  (Tr. 235).   On May 5, 2002, Dr. Chua performed a cystoscopy and extraction of a double J stent. (Tr. 228).  The notes also indicate that Claimant had lithotripsy several times. (Tr.  235).  As a result of his review, the ALJ specifically stated in his report that Claimant "has objectively evidenced...history of recurrent kidney stones...."  (Tr. 19).  In this case, the ALJ has sufficiently articulated his opinion, thereby enabling the Court  to determine whether the ALJ considered and assessed the relevant evidence.  Accordingly, the ALJ properly evaluated Dr. Chua's records, even though he did not articulate it in so many words.

After reviewing the record, the Undersigned finds that the ALJ properly evaluated the medical evidence of record and, therefore,  his finding was supported by substantial evidence. Accordingly, the ALJ did not err when he did not give controlling weight to the opinion of Dr. Khan, properly evaluated Dr. Chua's records and afforded proper weight to Dr. Berad's opinion.

2. Failing to Include Irritable Bowel Syndrome as a Severe Impairment
and
Incomplete Hypothetical to the Vocation Expert

Claimant next asserts two arguments:  that the ALJ should have considered Claimant's irritable bowel syndrome to be a severe impairment; and, that the ALJ should have included this

condition in his hypothetical to the vocational expert for consideration. The Commissioner counters that the ALJ correctly determined that irritable bowel syndrome was not a severe impairment, and the hypothetical that was posed to the vocational expert was proper.

The Commissioner follows a five-step process to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520. At step two, the ALJ hearing the case must determine whether the claimant has a medically severe impairment or combination of impairments. An impairment is severe only if it significantly limits a claimant's ability to do basic work activities. See 20 C.F.R. §404.1520(c). The burden of showing a medically determinable severe impairment or combination of impairments is on the claimant. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987).

Claimant concedes that the only references in the record relating to irritable bowel syndrome are her statements to Dr. Beard that she had "daily runny diarrhea and fecal urgency," which "usually occurs right after she eats." (Tr. 156). Additionally, both Dr. Brown and Dr. Lauderman reported that Claimant listed this condition as one of her impairments. (Tr. 161, 163, 169). Claimant points to no place in the record demonstrating that she was treated for irritable bowel syndrome. Accordingly, because Claimant did not establish that irritable bowel syndrome limited her ability to do basic work activities, the ALJ properly determined that it was not a severe impairment.

Additionally, the ALJ noted that, although Claimant's symptoms appeared to be exaggerated, the ALJ "considered her related allegations and accorded them appropriate weight in assessing her residual functional capacity." (Tr. 20). Specifically, in his decision, the ALJ noted that Claimant has had the RFC to perform a range of work that "allows unscheduled use of a

restroom on an average of once per hour." (Tr. 25).

The Fourth Circuit Court of Appeal has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. Russell v. Barnhart, No. 02-1201, 2003 U.S. App. LEXIS 2178 (4th Cir. Feb. 7, 2003). The court further stated that the hypothetical question may omit non-severe impairments, but must included those that the ALJ finds to be severe. Id. In his question, although there was no evidence of irritable bowel syndrome, the ALJ limited Claimant to jobs which allow "to use a restroom on an unscheduled basis." (Tr. 26). Therefore, because there was no support for this condition in the record, the ALJ did not err in failing to cite it as a limitation in his question.

### 3. Failing to Properly Consider Claimant's Obesity

Claimant also contends that the ALJ failed to properly consider her obesity. The Commissioner asserts that the ALJ correctly consider Claimant's obesity.

In his decision, the ALJ stated that "the claimant has objectively evidenced...obesity...," which, in combination with other conditions, was found to be "severe" within the meaning of the Regulation. (Tr. 19). Therefore, at step two, the ALJ acknowledged that Claimant's obesity significantly limited her ability to perform basic work activities. See 20 C.F.R. § 404.1520(c). However, at step three, the ALJ correctly determined that obesity, either individually or in combination with other impairments, did not meet or medically equal the severity criteria for any of the listed impairments. (Tr. 26). At step four, the ALJ accommodated the limitation imposed by obesity in his RFC assessment by limiting Claimant to light work with no more than occasional balancing, climbing, crawling, crouching, kneeling or stooping and no more than

fifteen consecutive minutes of standing/walking at a time, not to exceed four cumulative hours of

standing/walking within an eight-hour workday. (Tr. 26). Finally, the ALJ concluded that

Claimant retained the ability to perform a range of light work with numerous restrictions and

could perform her past work as a secretary.[12] (Tr. 26).

In her Motion for Summary Judgment, Claimant cites the decision in Yeager v. Barnhart,

1:02-CV-54. Claimant's reliance on Yeager is misplaced. In Yeager, the Court found that the

ALJ failed to consider obesity at all in determining whether the claimant met a Listing or in her

RFC. In this case, however, the ALJ properly considered the impact of Claimant's obesity on her

ability to function at all steps of the disability evaluation.

4. Failure to Conduct a Proper Credibility Analysis
and
The Appeals Council's Failure to Properly Consider New Evidence

Claimant next combines two arguments: that the ALJ failed to conduct a proper credibility

analysis; and, that a remand is required in light of the December 2003 letter from Dr. Syed Haq,

submitted to the Appeals Council. The Commissioner contends that the ALJ conducted a proper

credibility analysis, and that a remand for consideration of Dr. Haq's letter is inappropriate.

"Because he had the opportunity to observe the demeanor and to determine the credibility

of the claimant, the ALJ's observations concerning these questions are to be given great weight."

Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984)(citing Tyler v. Weinberger, 409 F. Supp.

776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the

witnesses and assess their forthrightness, we afford their credibility determinations special

deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an

---

[12] The ALJ also stated that Claimant's obesity did not preclude her ability to generally
perform her work as a secretary. (Tr. 26).

ALJ's credibility determination only if the claimant can show it was 'patently wrong'" <u>Powers v.</u> <u>Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)(citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990)).

The determination of whether a person is disabled by pain or other symptoms is a two step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996). Evidence of a claimant's activities as affected by the pain is relevant to the severity of the impairment. <u>Id</u>. at 595.

In considering Claimant's credibility, the ALJ considered all of the evidence, including the physicians'opinions, Claimant's medical history and diagnoses, her subjective allegations of pain and her daily activities and found her not entirely credible. 20 C.F.R. § 404.1529 (Tr. 23). The ALJ noted that the medical records reveal that Claimant had "medically determinable impairments that could reasonably be expected to cause some of the symptoms she had described." (Tr. 23). This satisfies the first prong of the <u>Craig test</u>. However, the ALJ found that Claimant's subjective complaints were not supported by the medical evidence. (Tr. 19-20). The ALJ noted that, although Claimant testified that she needed to use the bathroom twenty to thirty times over the two-hour period after taking a fluid pill, she did not report her extreme urgency problems to her physicians. (Tr. 19). As the ALJ noted, there is no record supporting Claimant's assertion. (Tr. 19). Claimant further argues that "a simple reading of the [Personal Pain Questionnaire and Activity of Daily Living] forms shows that neither contains any questions

regarding urinary frequency/urgency." A review of said forms reveals, however, that they contain a section entitled "Remarks," where Claimant did mention that "sometimes I keep diarrea (sic). Sometimes I have to stop everything just to run to the bathroom." (Tr. 91). Claimant, however, failed to report her alleged urgency problems.

Claimant also provided a personal log indicating that, on eleven particular days in August, 2003, her blood sugars had ranged from 170 to 260 and her blood pressure had ranged from 170/110 to 210/110. (Tr. 20). The ALJ found that Claimant's blood sugars and high blood pressure readings were not consistent with the rest of the medical evidence. (Tr. 20). For example, the note from Davis Memorial Hospital, dated October 2, 2002, indicates that Claimant's blood pressure was 158/84. (Tr. 124). Dr. Beard's note, dated December 22, 2002, indicates that Claimant's high blood pressure was 140/98. (Tr. 157). Additionally, on October 23, 2002, Dr. Khan reported that Claimant's blood sugars were improving. (Tr. 197). The ALJ also noted that Claimant's weight loss indicates some improvement in her diabetic condition. Accordingly, the ALJ found that Claimant's assertions appeared exaggerated in light of the medical evidence. (Tr. 25).

The ALJ also considered Claimant's allegations that she had shortness of breath, chest pain or other condition that made it "impossible to breathe." (Tr. 20). The ALJ noted that in October, 2002, Claimant had a normal stress test, and studies of her chest and heart revealed no abnormalities. (Tr. 21). In light of all of the medical records,[13] the ALJ concluded that "the objective medical evidence fails to substantially support the claimant's subjective allegations."

---

[13] With regard to smoking, Claimant addressed the issue by submitting a letter from Dr. Chua in support for her contention that she has never smoked. (Tr. 312). However, as discussed above, the ALJ's credibility determination is, nevertheless, supported by substantial evidence.

(Tr. 21).

Additionally, in her October 2002 disability application, Claimant acknowledged her
ability to engage in various activities, including, but not limited to: shopping for food, books and
medication; caring for her son and elderly friend by making meals, cleaning and doing general
housework, filling medication, paying bills and providing transportation; visiting friends or
relatives daily; and enjoying hobbies, such as playing a musical instrument, gardening, swimming
and attending church services. (Tr. 22, 99-102). Claimant also listed walking as a hobby, but
noted that she could not "walk or stand for long periods of time without pain." (Tr. 22). The ALJ
noted that Claimant's written assertions indicated that she had pain "primarily if she walked 'a
lot' or stood for long periods of time and that her breathing difficulties occurred if she 'overdid'
things or if it was too hot." (Tr. 22). Therefore, the ALJ concluded that Claimant retained the
ability to work with "appropriate restrictions." (Tr. 23). This satisfies the second prong of the
<u>Craig</u> test.

After considering Claimant's subjective complaints, objective evidence, and her daily
activities, the ALJ determined that Claimant's allegations regarding her impairments and work-
related limitation were not fully credible. (Tr. 26). Therefore, the ALJ properly assessed
Claimant's credibility.

Claimant also argues that the ALJ's decision is not supported by substantial evidence in
light of the December 2003 letter from Dr. Syed Haq, submitted to the Appeals Council, which
suggests that Claimant was referred to an advanced diabetes center for management of her
condition.

The Appeals Council must consider evidence submitted with the request for review in

deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (en banc). Evidence is new within the meaning of this section if it is not duplicative or cumulative. Id. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Id. (citing Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985)).

Because the Appeal Council specifically incorporated Dr. Haq's letter, dated December 8, 2003, into the record, the Court must review the entire record in order to determine whether substantial evidence supports the Commissioner's findings. See Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972)(reviewing courts are restricted to administrative record in determining whether Commissioner's decision is supported by substantial evidence). See also, Wilkins, 953 F.2d at 96. In the present case, the evidence submitted to the Appeals Council does not change the weight of evidence supporting the Commissioner's decision. Dr. Haq's letter, addressed to Dr. Khan, is not "new" or "material" evidence and, therefore, is not grounds for a remand. In his letter, Dr. Haq states that he "concur[s] with [Dr. Khan] that this patient needs insulin therapy. Since you [Dr. Khan] have already committed the patient to Lantus insulin, I have decided to continue with that." (Tr. 313). A review of Claimant's records reveals that Dr. Haq's finding that Claimant had "uncontrolled diabetes" that required insulin therapy treatment was previously addressed in the evidence submitted to the ALJ, such as Dr. Khan's treatment notes. (Tr. 194, 198-199, 201-202, 206, 313). There is no reasonable possibility that the additional evidence would have changes the outcome. See Wilkins, 953 F.2d at 96. Therefore, Claimant's additional evidence, which was considered by the Appeals Council, is not grounds for

a remand.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED, and Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ (1) properly considered Claimant's treating and examining physicians' opinion; (2) correctly determined that irritable bowel syndrome was not a severe impairment and posed a proper hypothetical to the VE; (3) properly considered Claimant's obesity; and (4) conducted a proper credibility analysis. Finally, Claimant's additional evidence, submitted to the Appeals Council, does not require a remand.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 6, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE